UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

-v.-

DAVID ROSARIO,

Defendant.

96 Cr. 126-23 (KPF)

**ORDER**

KATHERINE POLK FAILLA, District Judge:

David Rosario served as enforcer and hit man for a violent drug trafficking crew for a period of years beginning in 1989. Even while incarcerated on state charges, Rosario orchestrated the killings of at least two people. After his federal conviction on murder in aid of racketeering and similar offenses, Rosario was sentenced principally to an aggregate term of life imprisonment plus five years. Thereafter, Rosario filed an appeal from his conviction and several post-conviction motions, none of which succeeded.

Rosario now moves for compassionate release, in the form of a reduction in sentence to time served, pursuant to 18 U.S.C. § 3582(c)(1)(A)(i), proffering several bases for relief. The Government opposes Rosario's motion. For the reasons set forth in the remainder of this Order, the Court denies Rosario's motion.

**A.    Factual Background**

For a period of years beginning in the late 1980s, Ramon Velasquez operated a wide-ranging, and extremely lucrative, cocaine trafficking network that serviced the New York City metropolitan area and was known as the Velasquez Organization (the "Organization").  (PSR ¶ 37).  At its height, the Organization employed approximately 20 individuals and realized annual revenues in the millions of dollars.  (*Id.*).  Members of the Organization, including Rosario, conspired to engage and did engage in acts of violence on the Organization's behalf; these acts were directed at customers who owed the Organization money, individuals believed to be cooperating with law enforcement, and members of the Organization who were believed to have "stolen money from or breached a rule or regulation of the Velasquez Organization."  (*Id.*).  As a further deterrent, the Organization also threatened and committed acts of violence against the family members of these putative transgressors.  (*Id.*).

Rosario was hired by Velasquez in late 1989 specifically for his aggressive and violent tendencies; his task was "to collect debts from those who owed Velasquez money and to kill those who wouldn't pay or were otherwise

---

[1]     For ease of reference, the Court refers to Rosario's *pro se* submission in support of his motion for compassionate release as "Def. Pro Se Br." (Dkt. #855); to his counseled submission in support of his motion as "Def. Br." (Dkt. #862); to the Government's submission in opposition to his motion as "Gov't Opp." (Dkt. #866); to his Presentence Investigation Report as "PSR" (Gov't Opp., Ex. B); and to the transcript of Rosario's trial as "Tr."

causing Velasquez problems." (Tr. 20; *see also id.* at 341 (noting that Rosario referred to himself as "Trigger Don")). To that end, Rosario was involved in numerous acts of violence in 1990 and 1992 in furtherance of the Organization. (*See, e.g.,* PSR ¶¶ 39-43, 52, 82). In May 1990, in response to a dispute with Juan Valdez, the owner of an auto body shop with whom Rosario contracted to repair and make bulletproof his car, Rosario conspired with an individual named James Brown to kill Valdez; he then accompanied Brown on May 30, 1990, to Valdez's shop, where Brown shot Valdez and his brother, killing the former and wounding the latter. (*Id.* ¶¶ 39-40). Later in 1990, Rosario resolved a dispute with insurance broker Sarah Wagner by contracting with Brown a second time to shoot and kill Wagner, which killing occurred on December 5, 1990. (*Id.* ¶¶ 41-43). As fate would have it, Rosario had been jailed since September 1990 on state charges that included attempted murder. (*Id.* ¶¶ 124-128, 134-135). In consequence, Rosario planned the murder of Wagner during a prison visit from Brown. (*Id.* ¶¶ 41-42).

In mid-1992, Rosario met with Brown and Ismael Delgado — again while incarcerated on the state charges — during which meeting Rosario offered them a contract to kill Juan Tavares, whom he described as a man who "owed [Rosario's] people a lot of money." (*See* PSR ¶ 82; Tr. 1129-41). Brown, in turn, subcontracted the killing to Sean Blair, who worked for a fellow drug dealer known as "Spidey" (*i.e.*, co-defendant Irving Mason). (*Id.*). Tavares was shot to death on July 24, 1992. (PSR ¶ 82).

**B. Procedural History**

**1. The Indictment, Trial, and Sentencing**

Rosario was first named as a defendant in a superseding indictment, Indictment S9 96 Cr. 126 (JFK) (the "Indictment"), that was filed in this District on January 21, 1997. (Dkt. #85). The Indictment contained 116 counts, and charged Rosario and four co-defendants with participating in and conspiring to participate in a racketeering enterprise, the Velasquez Organization, through a pattern of racketeering activity, in violation of 18 U.S.C. §§ 1961 and 1962(c)-(d). The case was initially assigned to Judge Allen G. Schwartz, and later transferred to Judge John F. Keenan.

The Indictment was subsequently redacted for Rosario's trial to include only the five counts against Rosario. (*See* PSR ¶¶ 5-19; Def. Br., Ex. A; Gov't Opp. 1). Counts One and Two charged Rosario and others with conspiring to participate in the Velasquez Organization through a pattern of racketeering activity, in violation of 18 U.S.C. §§ 1961 and 1962(c)-(d). The specific racketeering acts alleged included, among others, the conspiracies to murder and the murders of Juan Valdez, Sarah Wagner, and Juan Tavares. (PSR ¶¶ 7-15). Counts Three and Four charged Rosario and others with conspiracy to commit murder, and murder, of Juan Tavares, in violation of 18 U.S.C. §§ 1959(a)(1), (a)(5), and 2. Count Five charged Rosario and others with using and carrying a firearm during and in relation to the crimes of violence charged in Counts One, Two, Three, and Four, in violation of 18 U.S.C. §§ 924(c) and 2.

4

Trial against Rosario alone began on December 3, 1997, and concluded on January 15, 1998, with a guilty verdict. (Minute Entries for January 15, 1998). The evidence at trial included testimony from law enforcement and accomplice witnesses (including Brown); telephone and visitation records from state and city prisons where Rosario had been housed; and intercepted telephone and beeper communications. (*See generally* Tr.). Of potential note, though Rosario was convicted of all five counts, the jury found to be proven the predicate racketeering acts relating to the above-described conspiracies to murder, but not those relating to the murders themselves. (PSR ¶ 20).

In connection with Rosario's sentencing, the Probation Office prepared a Presentence Investigation Report that included a calculation of the United States Sentencing Guidelines (the "Guidelines" or "U.S.S.G."). The Probation Office concluded that Rosario's Guidelines offense level was 46 and that his Criminal History Category was II, which yielded a Guidelines range of lifetime imprisonment, plus a consecutive term of five years' imprisonment on Count Five. (PSR ¶¶ 101-139).

Sentencing took place on June 12, 1998. (*See* Gov't Opp., Ex. G (sentencing transcript)). During the sentencing proceeding, defense counsel read a statement prepared by Rosario, wherein Rosario maintained his innocence, argued that his trial had been unconstitutional, "commend[ed] the prosecutors along with the federal agents for creating one hell of an illusion of guilt in this courtroom," and decried Judge Keenan as biased and hypocritical. (*Id.* at 7-13). Ultimately, Judge Keenan imposed an aggregate term of life

imprisonment on Counts One, Two, Three, and Four, followed by a consecutive term of five years on Count Five. (*Id.* at 14-15). Judge Keenan ordered that this term of imprisonment be served consecutively to an existing 40-year sentence that Rosario was serving in New York State court relating to his attempted murder of two police officers. (*Id.* at 15).

### 2. Rosario's Appeal and Collateral Challenges to His Sentence

Rosario filed a notice of appeal from his conviction. (Dkt. #276). On appeal, he argued that

> insufficient evidence support[ed] his conviction; the jury made reversibly inconsistent findings; government witnesses were "bribed" in violation of 18 U.S.C. § 201(c)(2); the district court improperly admitted into evidence co-defendant plea allocutions; the district court improperly admitted into evidence documents obtained from an unlawful search and seizure; the district court erred by applying retroactively the law announced in *Salinas* v. *United States*, 522 U.S. 52, 118 S.Ct. 469, 139 L.Ed.2d 352 (1997); and the district court erred by issuing a charge under *Pinkerton* v. *United States*, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946).

*United States* v. *Velasquez*, 173 F.3d 847, 1999 WL 137318, at *1 (2d Cir. 1999) (summary order). The Second Circuit rejected all of these challenges in a summary order dated February 22, 1999. *Id.*

In July 2001, the Court received a motion from Rosario to vacate, set aside, or correct his sentence, pursuant to 28 U.S.C. § 2255. (*See* Dkt. #557 (scheduling order)). Among other things, Rosario argued that (i) insufficient evidence supported his convictions; (ii) the Court had unduly intruded into the jury's fact-finding function; and (iii) he had received ineffective assistance from

6

his trial counsel. *See Rosario* v. *United States*, No. 01 Civ. 6230 (JFK), 2005 WL 3543967, at *1 (S.D.N.Y. Dec. 27, 2005). In an order issued on August 27, 2004, Judge Keenan denied Rosario's Section 2255 motion (Dkt. #617), and in subsequent orders Judge Keenan denied Rosario's requests for a certificate of appealability (Dkt. #654, 655). Rosario appealed these denials to the Second Circuit, which dismissed the appeal for procedural irregularities. (Dkt. #667).

Rosario later sought leave from the Second Circuit to file a second or successive Section 2255 motion, claiming new evidence in the form of a Drug Enforcement Administration ("DEA") Form 6 memorializing the post-arrest statement of Sean Blair, the man to whom Brown had subcontracted the killing of Juan Tavares. *See Rosario* v. *United States*, No. 18-2848, Dkt. #1-2 at 5 (petition), 38 (opposition) (2d Cir.). The Second Circuit ultimately denied his motion in an order dated January 28, 2019, after finding that any discrepancies in the trial evidence were minor and unrelated to Rosario's role in the Tavares murder, and, further, that Rosario had failed to make a *prima facie* showing of actual innocence. (Dkt. #801 (mandate)).

Separately, in June 2016, Rosario sought the appointment of counsel to determine whether he qualified for relief in light of the Supreme Court's decision in *Johnson* v. *United States*, 576 U.S. 591 (2015), which invalidated the residual clause of the Armed Career Criminal Act. Judge Keenan appointed the Federal Defenders of New York to review his case, and counsel ultimately concluded that relief was not available to Rosario because he had other,

concurrent life sentences. (*See* Dkt. #782 (order resolving motion for appointment of counsel)).

### 3. Rosario's State and Federal Sentences

As noted, while engaged in the conduct underlying the instant Indictment, Rosario was prosecuted in New York State Supreme Court, New York County, for charges including attempted murder. Ultimately, he was convicted after a jury trial and sentenced to an aggregate term of 40 years' to life imprisonment. (PSR ¶ 124). The Court understands from the website of the New York State Department of Corrections and Community Supervision that Rosario is serving his state sentence now (albeit in federal custody), and that his earliest parole eligibility date is September 4, 2030. https://nysdoccslookup.doccs.ny.gov/ (last accessed July 22, 2024).

The Court further understands from the federal Bureau of Prisons ("BOP") that, contrary to Judge Keenan's directives at sentencing, Rosario has received credit against his federal sentence for the time he has spent in federal custody, despite primary jurisdiction residing with New York State. *See also* 18 U.S.C. § 3585 (outlining procedure for award of sentencing credit). The Court has also reviewed Rosario's disciplinary history while in federal custody, which history discloses dozens of infractions between 1997 and 2021, ranging in severity from insolence to a staff member, to multiple infractions for using controlled substances like cocaine and heroin, to possession of a dangerous weapon, to assault resulting in serious injury. (Disciplinary Records).

8

### 4. The Instant Motions

On or about December 8, 2023, Rosario filed a *pro se* motion for compassionate release, in the form of a modification of his sentence to a term of time served, pursuant to 18 U.S.C. § 3582(c)(1)(A)(i). (Dkt. #855). Initially, Rosario's grounds for compassionate release echoed those of his attempted second or successive Section 2255 motion; he claimed that the Government had failed to disclose notes of a law enforcement interview of Sean Blair, in which interview Blair confessed to shooting Juan Tavares. (*Id.*). That same day, the case was transferred to the undersigned.[2]

In an order dated December 14, 2023, the Court appointed Natali J.H. Todd pursuant to the Criminal Justice Act in order to assist Rosario with his motion. (Dkt. #856).[3] Defense counsel filed a counseled supplemental submission on March 14, 2024. (Dkt. #862). The Government filed its opposition submission on May 1, 2024. (Dkt. #866).

## APPLICABLE LAW

Under 18 U.S.C. § 3582(c)(1)(A)(i), as modified by the First Step Act, Pub. L. No. 115-391, 132 Stat. 5194 (Dec. 21, 2018) (the "FSA), a court may reduce a defendant's sentence upon motion of the Director of the BOP, or upon motion of the defendant. A defendant may move under § 3582(c)(1)(A)(i) only after the defendant has "fully exhausted all administrative rights to appeal a

---

[2]    Because the Court only recently received the case, it reviewed documents on the docket beyond those materials cited or submitted by the parties, including the transcript of Rosario's trial.

[3]    The Court pauses to thank Ms. Todd for her excellent work on this case.

failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." *Id.*

When considering an application under § 3582(c)(1)(A)(i), a court may reduce a defendant's sentence only if it finds that "extraordinary and compelling reasons warrant such a reduction," and that "such a reduction is consistent with the applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A)(i); *see generally United States* v. *Kimbell*, No. 21-288, 2021 WL 5441249, at *1 (2d Cir. Nov. 22, 2021) (summary order). The Second Circuit has summarized the standards pursuant to which district courts must evaluate compassionate release applications:

> A court deciding a compassionate release motion can consider "the full slate of extraordinary and compelling reasons that an imprisoned person might bring before [it]." *United States* v. *Brooker*, 976 F.3d 228, 237 (2d Cir. 2020). But there are three requirements that must be satisfied before a court can grant such relief. First, absent waiver or forfeiture by the government, an inmate must exhaust administrative remedies by requesting such relief from prison authorities. Specifically, an inmate may ask the sentencing court to consider reducing a sentence only "after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." 18 U.S.C. § 3582(c)(1)(A); *see also United States* v. *Saladino*, 7 F.4th 120, 124 (2d Cir. 2021) (holding that the government may waive or forfeit the exhaustion requirement). Second, a court must "consider[ ] the factors set forth in [18 U.S.C. §] 3553(a) to the extent that they are applicable." 18 U.S.C. § 3582(c)(1)(A); *see* [*United States* v. *Jones*, 17 F.4th 371, 374-75 (2d Cir.

> 2021)].  Section 3553(a), in turn, lists numerous factors a court must review when imposing a sentence.  These include, as most relevant here, "the nature and circumstances of the offense and the history and characteristics of the defendant"; "the need for the sentence imposed … to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense"; "the need for the sentence imposed … to provide the defendant with … correctional treatment in the most effective manner"; and "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  18 U.S.C. § 3553(a).  Third, the inmate must demonstrate that his proffered circumstances are indeed "extraordinary and compelling" such that, in light of these § 3553(a) factors, a sentence reduction is justified under § 3582(c)(1)(A) and would not simply constitute second-guessing of the sentence previously imposed.

*United States* v. *Keitt*, 21 F.4th 67, 71 (2d Cir. 2021); *accord United States* v. *Halvon*, 26 F.4th 566, 570 (2d Cir. 2022).  The district court's discretion includes the power to reduce, as well as to eliminate, the remaining term of a defendant's sentence.  *See Brooker*, 976 F.3d at 237.

In Amendment 821 to the United States Sentencing Guidelines (the "Guidelines" or "U.S.S.G."), effective as of November 1, 2023, and later made retroactive, the Sentencing Commission amended the policy statement contained at U.S.S.G. § 1B1.13 in order to provide guidance as to what constitutes extraordinary and compelling circumstances in defendant-initiated (as distinguished from BOP-initiated) compassionate release requests.  This amendment "now controls the analysis of a compassionate release motion, however initiated."  *United States* v. *Lopez*, No. 16 Cr. 317-22 (PAE), 2024 WL 964593, at *2 (S.D.N.Y. Mar. 5, 2024).

11

Among the conditions listed as potential extraordinary and compelling

circumstances are the following:

> "(b) Extraordinary and Compelling Reasons. — Extraordinary and compelling reasons exist under any of the following circumstances or a combination thereof:
>
> (1) MEDICAL CIRCUMSTANCES OF THE DEFENDANT —
>
> ***
>
> (B) The defendant is —
>
> (i) suffering from a serious physical or medical condition,
>
> (ii) suffering from a serious functional or cognitive impairment, or
>
> (iii) experiencing deteriorating physical or mental health because of the aging process,
>
> that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover[; or]
>
> (C) The defendant is suffering from a medical condition that requires long-term or specialized medical care that is not being provided and without which the defendant is at risk of serious deterioration in health or death.
>
> ***
>
> (5) OTHER REASONS. — The defendant presents any other circumstance or combination of circumstances that, when considered by themselves or together with any of the reasons described in paragraphs (1) through (4), are similar in gravity to those described in paragraphs (1) through (4).
>
> ***
>
> (6) Unusually Long Sentence. — If a defendant received an unusually long sentence and has served at least 10

years of the term of imprisonment, a change in the law (other than an amendment to the Guidelines Manual that has not been made retroactive) may be considered in determining whether the defendant presents an extraordinary and compelling reason, but only where such change would produce a gross disparity between the sentence being served and the sentence likely to be imposed at the time the motion is filed, and after full consideration of the defendant's individualized circumstances.

(c) Limitation on Changes in Law. — Except as provided in subsection (b)(6), a change in the law (including an amendment to the Guidelines Manual that has not been made retroactive) shall not be considered for purposes of determining whether an extraordinary and compelling reason exists under this policy statement. However, if a defendant otherwise establishes that extraordinary and compelling reasons warrant a sentence reduction under this policy statement, a change in the law (including an amendment to the Guidelines Manual that has not been made retroactive) may be considered for purposes of determining the extent of any such reduction.

(d) Rehabilitation of the Defendant. — Pursuant to 28 U.S.C. § 994(t), rehabilitation of the defendant is not, by itself, an extraordinary and compelling reason for purposes of this policy statement. However, rehabilitation of the defendant while serving the sentence may be considered in combination with other circumstances in determining whether and to what extent a reduction in the defendant's term of imprisonment is warranted.

U.S.S.G. § 1B1.13(b)-(d).

The "existence of 'extraordinary and compelling reasons' for a reduction does not mean that a district court must release the defendant." *United States* v. *Madoff*, 465 F. Supp. 3d 343, 349 (S.D.N.Y. 2020).  Even if a court finds that a defendant has established an extraordinary and compelling reason for a reduction in sentence, it still must then consider the factors set forth in 18

U.S.C. § 3553(a). *See* 18 U.S.C. § 3582(c)(1)(A)(i). "The defendant has the burden to show he is entitled to a sentence reduction." *United States* v. *Ebbers*, No. 02 Cr. 1144-3 (VEC), 2020 WL 91399, at \*4 (S.D.N.Y. Jan. 8, 2020) (citing *United States* v. *Butler*, 970 F.2d 1017, 1026 (2d Cir. 1992)); *accord United States* v. *Jacques*, No. 20-3276, 2022 WL 894695, at \*1 (2d Cir. Mar. 28, 2022) (summary order).

## DISCUSSION

### A. Rosario Has Not Demonstrated Extraordinary and Compelling Circumstances

Rosario relates that he has administratively exhausted his claims by filing a request with the Warden of the Federal Correctional Institution at Coleman, Florida ("FCI Coleman"), that was rejected by the Warden. (Def. Pro Se Br. 26-27). The Government does not contest the fact of the request, but argues that Rosario has not administratively exhausted his claims because his counseled claims were not presented in that request. (Gov't Opp. 3). While the Government makes a strong argument against exhaustion, this Court will proceed to consider the merits of Rosario's arguments.

In his *pro se* submission, Rosario claims that his trial was tainted by disclosure violations on the part of the Government, but also argues that a reduction in sentence is warranted to reflect his growth while incarcerated and to avoid unwarranted sentence disparities. (Def. Pro Se Br. 4-19). In his counseled submission, Rosario proffers additional facts as potential extraordinary and compelling circumstances, including: (i) his post-sentencing rehabilitation, as evidenced by his educational and disciplinary records while

incarcerated, and by a reentry plan that includes promised employment (Def. Br. 2, 6-10); (ii) his medical conditions (*id.* at 9); (iii) his age at the time of the offense conduct (*id.* at 11-13); and (iv) putative sentencing disparities among other defendants convicted of murder and among his co-defendants (*id.* at 2, 7-8). The Court has considered Rosario's arguments and evidence carefully, and ultimately concludes that, taken individually or in the aggregate, the facts presented do not qualify as extraordinary and compelling.

The Court takes Rosario's claims out of order, and begins by addressing what does not suffice — which here includes Rosario's efforts in his *pro se* and counseled submissions to cast doubt on the validity of his conviction. (*See* Def. Pro Se Br. 4-11; Def. Br. 3-4 & Ex. B). A defendant — particularly one who has made full use of his direct appeal and collateral challenge opportunities without success — may not use a compassionate release motion to obtain a "third bite at the apple," as it were, to challenge his conviction. *See United States* v. *Fernandez*, 104 F.4th 420, 430 (2d Cir. 2024) ("Absent such a clear declaration of intent, we conclude that since challenges to the validity of a conviction must be made under section 2255, they cannot qualify as 'extraordinary and compelling reasons' under section 3582(c)(1)(A). Compassionate release is not a channel to habeas relief or an end run around the limitations of section 2255."); *see also, e.g.*, *Jacques*, 2022 WL 894695, at *2 ("Permitting Jacques to make actual innocence arguments [under § 3582(c)(1)(A)(i)] would enable him to pursue habeas relief through a compassionate release motion and thereby evade the procedural limitations on

15

bringing habeas claims.  Jacques's arguments as to the validity of his conviction therefore do not provide a ground for remanding to the district court.").  Accordingly, the Court will not engage to any significant degree with any of Rosario's challenges to his conviction.  It is sufficient for the Court to note that the statements in the interview memorandum to which Rosario cites are not inconsistent with the Government's theory of the case at trial, and that Rosario has not otherwise made a threshold showing of actual innocence.

As for Rosario's proffered health issues, it is true that under U.S.S.G. § 1B1.13, a defendant's medical conditions can be extraordinary and compelling where the defendant (i) is "suffering from a terminal illness"; (ii) is suffering from serious medical conditions "that substantially diminish[] the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover"; (iii) is "suffering from a medical condition that requires long-term or specialized medical care that is not being provided and without which the defendant is at risk of serious deterioration in health or death"; or (iv) is at risk for severe medical complications or death as a result of exposure to an ongoing outbreak of infectious disease or public health emergency.  U.S.S.G. § 1B1.13(b)(1). None of those has been demonstrated here.  Rosario's records disclose various medical conditions for which he is receiving care, including gastrointestinal, prostate, and pain issues, as well as vision and dental issues.  (*See* Medical Records).  For its part, the Court has reviewed several years' worth of Rosario's medical records, from which it concludes that Rosario is receiving appropriate

medical care; this includes medical appointments that Rosario attended, and that he failed to attend, in May 2024 at the United States Penitentiary Hazelton in Bruceton Mills, West Virginia ("USP Hazelton"). While it is true that Rosario has a number of medical conditions, this Court cannot say that he is receiving no or inadequate medical care in BOP custody, and thus rejects his medical conditions as an extraordinary and compelling circumstance.[4]

Separately, Rosario argues that his young age at the time of the offense conduct (*i.e.*, 21-24 years old) constitutes an extraordinary and compelling circumstance. (Def. Br. 11-13). Though the Second Circuit has not specifically opined on the issue, courts within the Second Circuit have accepted, and rejected, youth as a valid basis for a sentence reduction under § 3582(c)(1)(A)(i). *Compare, e.g., United States* v. *Peeler*, No. 99 Cr. 67 (MPS), 2024 WL 1636710, at *4 (D. Conn. Apr. 16, 2024) (noting that a "district court may consider a defendant's age at the time of the offense conduct as an extraordinary and compelling reason," but declining to reduce sentence where offense of conviction "was not a product of rash immaturity, a momentary misjudgment of youth, or peer pressure"), *and Brito* v. *United States*, No. 11 Cr. 576 (PKC), 2024 WL 1597787, at *5 (S.D.N.Y. Apr. 12, 2024) (granting reduction in sentence in light of defendant's "age of 17 years and eleven months at the time

---

[4]     Rosario notes in his counseled submission that he requires dentures, for which he has been waiting for seven years. (Def. Br. 10). Medical records produced by BOP suggest that Rosario was not added to the National Routine Care List until February 2024. (*See* July 12, 2024 email exchange between Rosario and USP Hazelton Dental Assistant T. Ruth). The Court has reached out to Regional Counsel for BOP and asked that Rosario's dental issues be promptly reevaluated by FCI Hazelton staff.

of the shooting, his horrific upbringing, his low I.Q. of 74, his mental illness and the 'additional reflection' now required of a judge sentencing a person whose crimes were committed while a juvenile"), *with United States* v. *Muse*, No. 09 Cr. 512 (LAP), 2024 WL 2958526, at *4 (S.D.N.Y. June 11, 2024) ("Counsel mentioned Defendant's young age at the time of the offense, the challenges he faced growing up in Somalia, and his mental health disorders. Those arguments were rejected at sentencing and are rejected now for the same reasons." (internal citations omitted)), *and United States* v. *Reyes*, No. 10 Cr. 863 (AKH), 2024 WL 2327135, at *1 (S.D.N.Y. May 22, 2024) ("Defendant knowingly participated in the cold-blooded killing of two individuals. His crime outweighs the reasons he gives for compassionate release: his age, harsh conditions during the COVID-19 pandemic, and a good prison record suggesting his rehabilitation. At 26 years old, he had sufficient maturity to know what he was doing. Furthermore, I took Defendant's age into consideration at sentencing ... and he has shown no age-related intervening circumstances warranting my reconsideration.").

A common theme among those courts that have allowed reductions on the basis of youth is that the offenses of conviction were "split-second" and "hot-headed." *United States* v. *Ramirez*, 571 F. Supp. 3d 40, 48-49 (S.D.N.Y. 2021), *cited in United States* v. *Johnson*, No. 92 Cr. 159-A, 2024 WL 1363673, at *6 (W.D.N.Y. Apr. 1, 2024). As a sister court in this District explained:

> Following significant advancements in neurology and psychology, it is now well-established that the lack of brain development present in youth tends to manifest in immature, risky decision-making out of their control.

> *See United States* v. *Ramsay*, 538 F. Supp. 3d 407, 417-18 (S.D.N.Y. 2021) ("[T]he frontal lobes, home to key components of the neural circuitry underlying 'executive functions' such as planning, working memory, and impulse control, are among the last areas of the brain to mature; they may not be fully developed until halfway through the third decade of life.") (quoting Sara B. Johnson *et al.*, Adolescent Maturity and the Brain: The Promise and Pitfalls of Neuroscience Research in Adolescent Health Policy, 45 J. Adolescent Health 216 (2009) (NIH Public Access Version), available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2892678/pdf/nihms207310.pdf, at 1).
>
> The risk of such decision-making is amplified in "high-pressure, time-sensitive, emotional contexts" (also referred to as "hot cognition") or if peer pressure is being imposed. *United States* v. *Golding*, No. 05 Cr. 538 (JSR), 2022 WL 2985014, at *3 (S.D.N.Y. July 27, 2022) (quoting *Ramsay*, 538 F. Supp. 3d at 417-20). Consequently, "penological goals apply with much less force to younger defendants in light of their immaturity, susceptibility to peer and other influences, [and] salvageability ...." *Golding*, 2022 WL 2985014, at *3 (citing *Montgomery* v. *Louisiana*, 577 U.S. 190, 208-210, 136 S.Ct. 718, 193 L.Ed.2d 599 (2016)).

*United States* v. *Van Putten*, No. 04 Cr. 803 (GBD), 2024 WL 1332024, at *9 (S.D.N.Y. Mar. 27, 2024) (emphasis added). Rosario's offenses of conviction, however, did not implicate "high-pressure, time-sensitive, emotional contexts." To the contrary, Rosario coldly and calmly ordered the execution of Juan Valdez because Rosario did not like the manner in which work was performed on his car. Worse yet, when Rosario was later detained on state charges of attempted murder — for allegedly shooting at policemen who were pursuing his vehicle as it fled from a different shooting incident — he continued to serve as a principal enforcer for the Organization. In that capacity, he orchestrated at

least two more killings from his prison cell, one of which was related to drug debts to the Organization, and the other of which was related to a perceived mishandling of the Organization's car insurance policies. On these facts, Rosario's age does not suffice.

Finally, Rosario argues that his rehabilitation and exemplary conduct while incarcerated amount to extraordinary and compelling circumstances. (*See, e.g.*, Def. Pro Se Br. 13-15; Def. Br. 2, 6, 9-10). Among other evidence, Rosario has submitted a letter of support from his daughter, a listing of the many courses he has taken while incarcerated, his receipt of his GED, and his plans for reentry. (*See* Def. Br., Ex. D, F). The Court has reviewed these materials with care, and commends Rosario for improving himself while incarcerated. However, the Court has also reviewed Rosario's disciplinary history, which includes infractions involving the possession of a dangerous weapon and assault. (Disciplinary Records). While it is true that the most recent of these incidents was some three years ago, there are enough incidents to suggest that Rosario continues to present disciplinary challenges to BOP staff.

Rehabilitation is not, by itself, sufficient to constitute an extraordinary and compelling circumstance, though "rehabilitation of the defendant while serving the sentence may be considered in combination with other circumstances in determining whether and to what extent a reduction in the defendant's term of imprisonment is warranted." U.S.S.G. § 1B1.13(d); *see also* 28 U.S.C. § 994(t) ("Rehabilitation of the defendant alone shall not be

considered an extraordinary and compelling reason."). The Court finds that Rosario's other bases for relief do not amount to extraordinary or compelling circumstances. It will not grant his motion based on his rehabilitation alone. *Cf. United States* v. *Muyet*, No. 95 Cr. 941 (LAP), 2024 WL 2830825, at *5 (S.D.N.Y. June 3, 2024) ("Simply put, the evidence of rehabilitation offered by Defendant does not, alone or in combination with all other relevant considerations, establish extraordinary and compelling reasons for a reduction in his sentence."); *United States* v. *Raposo*, No. 98 Cr. 185 (JPC), 2024 WL 165195, at *9 (S.D.N.Y. Jan. 16, 2024) ("And given the Court's findings that [the defendant's] other arguments do not constitute extraordinary and compelling reasons, even evidence of complete rehabilitation cannot suffice.").

**B.     The Section 3553(a) Factors Do Not Support a Sentence Reduction**

Ultimately, even were the Court to have found that one or more of Rosario's reasons amounted to an "extraordinary and compelling" circumstance, it would still deny his motion after considering the factors set forth in 18 U.S.C. § 3553(a). These factors include "the nature and circumstances of the offense and the history and characteristics of the defendant," as well as the needs "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense," "to afford adequate deterrence to criminal conduct," "to protect the public from further crimes of the defendant," and "to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." *See* 18 U.S.C. § 3553(a)(1), (a)(2)(A)-(C), (a)(6).

Rosario focuses his § 3553(a) arguments on claims of sentence disparity, but such claims are unavailing. While the Second Circuit has not foreclosed the possibility that a disparity in sentences could constitute an extraordinary and compelling reason, its most recent exegesis on these issues undermines Rosario's claims. In *United States* v. *Fernandez,* 104 F.4th at 428-29, the Court specifically rejected § 3582(c)(1) claims predicated on the differences between a defendant's sentence and the sentences imposed on cooperators and co-defendants who elected not to proceed to trial. *See id.* at 428 ("It is not 'extraordinary' (indeed, it should be expected) that a defendant who proceeds to trial and is convicted receives a longer sentence than his co-defendants who plead guilty to different crimes, accept responsibility, and assist the government by cooperating. … And lower sentences for cooperating defendants are explicitly contemplated by the sentencing statute, *see* 18 U.S.C. § 3553(e), and the Sentencing Guidelines, see U.S.S.G. § 5K1.1." (internal citations omitted)). More broadly, the Court found nothing extraordinary or compelling about the disparities in sentences among Fernandez's co-defendants. *Id.* ("Disparities between the sentences of coconspirators can exist for valid reasons, such as … the offenses of conviction, or one coconspirator's decision to plead guilty and cooperate with the government." (citing *United States* v. *Conatser,* 514 F.3d 508, 522 (6th Cir. 2008))).

So too here. Among Rosario's proffered comparators, co-defendants James Brown and Sean Blair cooperated with the Government; indeed, Brown was one of the principal witnesses at Rosario's trial. Irving Mason, though he

also went to trial, was not convicted of conspiracy to commit murder, which explains the difference in sentences. Finally, while Rosario notes that the charges against the head of the Velasquez Organization, Ramon Velasquez, were nolled in this District, he fails to mention that Velasquez was simultaneously prosecuted in the United States District Court for the Eastern District of New York, for which he received a sentence of life imprisonment. *See United States* v. *Velasquez*, No. 92 Cr. 1265 (E.D.N.Y.), Dkt. #240 (judgment); *see also id.*, Dkt. #276 (Memorandum and Order denying Velasquez's first motion for compassionate release), 283 (Memorandum and Order denying Velasquez's second motion for compassionate release).

Put simply, the § 3553(a) factors cited above counsel strongly in favor of maintaining the life-plus-five-years sentence that Rosario received. Even at a young age, the reputation of the self-described "Trigger Don" was such that when Ramon Velasquez told Pedro Lara that he needed "someone who was pretty violent, pretty aggressive," Lara immediately thought of Rosario. (Tr. 720-21). Later, during what was effectively Rosario's job interview to serve as the Organization's enforcer, Velasquez made clear to Rosario that his job would involve collecting drug debts in person from recalcitrant customers, and "turn[ing] off" (*i.e.*, killing) those who failed to pay up. (*Id.* at 723). Rosario readily accepted.

Over time, Rosario's reach expanded beyond deadbeat customers and would-be cooperators to include individuals who merely annoyed Rosario and/or the Organization, including an auto body shop owner and an insurance

broker.  The murders in which Rosario conspired were calculating, premeditated, and wholly unjustified.  And as mentioned earlier in this Order, Rosario continued to orchestrate murders on behalf of the Organization even after he was in jail, for a period of years, on other attempted murder charges.

On top of all of this is Rosario's continued refusal to accept responsibility for his heinous conduct, a refusal that persists to the present.  Indeed, Rosario proclaims that while "understand[ing] the nature of his charge," and "with all due respect to the victim's family," he "remains firm on his innocences."  (Def. Pro Se Br. 16).  This, despite the overwhelming evidence of his guilt presented at trial.  Rosario's continued unwillingness to accept responsibility, coupled with his extraordinary (and extraordinarily violent) criminal history, counsels against any reduction in his sentence.

### CONCLUSION

For the reasons stated above, the Court DENIES Rosario's motion for compassionate release under 18 U.S.C. § 3582(c)(1)(A)(i).  The Clerk of Court is directed to terminate the motions at docket entries 855 and 862.

SO ORDERED.

Dated:   July 24, 2024
       New York, New York

_____
    KATHERINE POLK FAILLA
   United States District Judge